UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| NETJETS SALES, INC; NETJETS AVIATION, INC; NETJETS SERVICES, INC, <br><br> Plaintiffs, <br><br> vs. <br><br> 26 NORTH AVIATION INCORPORATED, dba SKYSTREAM JET; DOE INDIVIDUALS 1-20; ROE BUSINESS ENTITIES 1-20, inclusive, <br><br> Defendants. | Case No. 3:23-CV-00332-ART-CLB <br><br> ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT <br> (ECF No. 31) |

Plaintiffs NetJets Sales, Inc., NetJets Aviation, Inc., and NetJets Services, Inc. (collectively, "NetJets") bring this action against Defendant 26 North Aviation, Incorporated, doing business as Skystream Jet ("Skystream"), alleging that Skystream's pilots were negligent in parking a Skystream aircraft near a NetJets aircraft, causing it damage from the Skystream jet's engine exhaust. Before the Court is Plaintiff's motion for partial summary judgment on liability. (ECF No. 31.) For the reasons set forth below, the Court denies Plaintiff's motion.

I.    **FACTUAL BACKGROUND**

      **A. Parties and Aircraft**

      Plaintiff NetJets runs a fractional aircraft program and operates a program fleet, which participants or "owners" can purchase or lease interests in. (ECF No. 31-1 at 2.)

[1] These participants can use aircraft in the program fleet to fly on demand. (*Id.* at 3.) The "Latitude" is a twin-engine jet seating up to eleven passengers and is a part of the NetJets program fleet. (*Id.*) At the time of the incident, NetJets had an ownership interest in the Latitude as well as a contractual obligation to

---

[1] The page numbers of exhibits cited in this order refer to the electronic filing page numbers, printed in blue at the top of each exhibit in the record.

participants to maintain the aircraft. (*Id.*) On July 9 and 10 2021, the Latitude was operated by pilots Jan Peter Versweyveld as the pilot-in-command ("PIC") and second-in-command ("SIC") Henrik Lundberg, both employed by NetJets. (ECF Nos. 35-7 at 3; 31-12 at 13; 35-8 at 3.)

At the time of the incident, Defendant Skystream was the operator of the "Global Express" aircraft. (ECF No. 31-22.) The Global Express is also a twin-engine jet seating up to 19 passengers. (*Id.*) On the night of July 9, 2021, the Global Express was operated by PIC Philip Adornado and SIC Kurt Zender, both employees of 26 North Aviation (Skystream). (ECF Nos. 31-3 at 4-5, 29; 31-4 at 5, 37; 31-5 at 3.)

**B. July 9, 2021 Incident**

On July 9, 2021, the Latitude landed and parked at KGTV airport around 8:45 p.m. (ECF No. 31-10.) KGTV is an airport that provides fixed-base operator ("FBO") services, such as refueling, maintenance, and parking. (ECF No. 31-11 at 3.) The flight data from the Latitude shows that the Latitude pilots engaged the control lock on the airplane before shutting down and leaving for the night. (ECF Nos. 31-13; 31-11 at 2.) The control lock is a mechanism that locks the controls of an aircraft and is designed to prevent damage to the systems and surfaces. (ECF Nos. 31-3 at 26; 35-3 at 11-12; 31-8 at 11-12.) The Federal Aviation Association ("FAA") requires that a control lock be able to withstand gusts of up to 65 knots, or approximately 72-73 miles per hour, without damage to aircraft surfaces or systems. (ECF No. 31-8 at 13.)

Later that night, at approximately 10:35 p.m., the Global Express landed at KVTG. (ECF Nos. 1 at ¶ 17; 9 at ¶17.) KGTV had closed for the night at 10:30 p.m. (ECF No. 9 at ¶ 16.) FBOs such as KVTG have operating hours and are not staffed by FBO personnel after hours; however, aircraft are still permitted to land and park after hours at FBOs. (ECF No. 31-11 at 3.) Because the FBO had closed, "wing walkers" or "marshallers" who direct pilots during taxiing and parking, were

1   not available to assist the Global Express pilots with parking that evening. (ECF
2   Nos. 31-11 at 4; 31-22 at 2.)

3       After landing, the Global Express pilots taxied the aircraft and parked it in
4   a spot adjacent to the Latitude. (ECF No. 31-14.) Both pilots were aware of the
5   Latitude's position. (ECF Nos. 31-2 at 36; 31-3 at 37-38; 31-4 at 94.) In
6   maneuvering the Global Express into the parking space, the pilots made a series
7   of turns, ultimately ending up with the tail of the Global Express pointing towards
8   the tail of the Latitude. (ECF Nos. 31-14; 31-8 at 7; 31-22 at 5.) The Global
9   Express pilots testified that they used ground idle thrust to maneuver the aircraft
10  into the parking space. (ECF Nos. 31-3 at 39; 31-4 at 23.) As the Global Express
11  was turned into its parking space, the exhaust from the Global Express engines
12  caused wind to hit the tail end of the Latitude. (ECF No. 31-14.) The video footage
13  shows the tail of the Latitude vibrating due to the force of the Global Express
14  exhaust. (*Id.*)

15      **C. Availability of Alternative Parking Options**

16      Plaintiff's expert's rebuttal report states that "the Global Express had
17  options to park in other areas rather than in a position that would result in a [sic]
18  directing its jet blast onto the NetJets Latitude," and that the pilots had the option
19  to park in "the same parking space in which they ultimately parked, but in the
20  opposite-orientation — with the engine exhaust directed toward an empty parking
21  spot in the aisle to the west, rather than toward the tail surfaces of the NetJets
22  Latitude." (ECF No. 31-21 at 4.) The PIC of the Global Express, Adornado, testified
23  that there were other parking options that would have avoided damage to the
24  Latitude. (ECF No. 35-4 at 9.) However, he also testified that he would not have
25  parked the Global Express in the same parking spot but in the opposite
26  orientation because he "would never park perpendicular to other airplanes," and
27  particularly where he did not know if the airport had aircraft towing capabilities.
28  (*Id.* at 8.) SIC of the Global Express, Zender, stated that parking in that way would

1    have blocked in other aircraft unless the airport had a way to move the plane.

2    (ECF No. 35-5 at 7.) Adornado also stated that an alternative parking spot to the

3    southeast would have created the "same scenario," with a risk of blasting another

4    aircraft. (ECF No. 35-4 at 7-8.) Zender stated that the pilots stopped and

5    identified two parking options, but there were "more airplanes" in the second

6    option which they did not ultimately choose, as well as "wing clearance" concerns

7    not present in the spot they ultimately chose. (ECF No. 35-5 at 140-41, 191.)

8        Zender testified that after weighing the parking options, the space they

9    chose "seemed like . . . the best option." (*Id.* at 3.) Defendant's expert testified

10   that without knowing the specific circumstances at the time, he believes the pilot

11   was "trying to put that aircraft in the best, safest place that they could," and that

12   "every time I look at this as a pilot, I go, well, I think I'm right where these guys

13   ended up." (ECF No. 35-1 at 5, 8.)

14       The Global Express pilots testified that when in doubt about having safe

15   clearance while taxiing, they could "just stop the aircraft" or "just shut the aircraft

16   down." (ECF Nos. 31-4 at 12, 19; 31-3 at 10.) Zender testified that in the same

17   scenario in the future he would be "more critical" and depending on the situation,

18   he might "just shut the airplane down." (ECF No. 31-3 at 44.)

19       **D. Exhaust Profile, Distance, and Angle**

20       The flight manual for the Global Express aircraft contains a diagram of the

21   "exhaust danger areas" behind the aircraft's engines. (ECF No. 35-2.) The

22   diagram shows cone-shaped areas behind the engines and corresponding wind

23   velocity for those areas based on distance from the engines. (*Id.*) An arrow

24   pointing to a cone extending 50 feet directly behind each engine says "102 mph."

25   (*Id.*) An arrow pointing to the center a larger yellow cone shaped area behind the

26   aircraft at approximately 100 feet behind the engine says "62 mph." (*Id.*) The

27   diagram does not include any other data points for wind speeds between 50 and

28   100 feet. (*Id.*) PIC of the Global Express Adornado testified that at 50 feet from

the engines, the velocity of the exhaust would be 102 in a "small area," and that at 100 feet from the engines, the velocity would be "like a cone of 62 miles per hour and then an exterior of 34 miles per hour." (ECF No. 31-4 at 22-23.) According to the testimony of the Global Express pilots, they are trained on jet blast profiles, and it is important for pilots to know the jet blast profile on the aircraft they are flying in order to "not cause damage to people or property on the ground." (ECF Nos. 31-4 at 66; 31-3 at 15-16.) Defendant's expert agreed that pilots have a safety obligation to know the effects of a jet blast. (ECF No. 31-2 at 14.)

Plaintiff's expert estimated that the distance between the back of the Global Express's engines at the time of the incident was approximately 50 feet. (ECF No. 31-8 at 10-11.) He reached this conclusion by using scaled measurements from the KGTV video footage, the published dimensions of the two aircraft, and the distance between the painted parking lines on the ground at KGTV, which is 83 feet. (*Id*.) Referencing the exhaust danger areas diagram, the expert concluded that that at this distance, the Latitude was subject to wind at a velocity of 102 miles per hour at idle trust, which would be expected to result in the damage that occurred to the aircraft. (*Id*. at 9.) The Defendant's expert did not opine on the distance between the two aircraft, but, as discussed below, Defendant argues that the methods Plaintiff's expert used were inaccurate.

Additionally, the parties dispute the precise angle at which the Global Express's tail was pointed towards the Latitude's tail. Plaintiff's expert report states that "the tail of the Global Express was directly facing the tail of Latitude, such that the exhaust from the Global Express's engine was aligned with the Latitude's tail surfaces." (ECF No. 31-8 at 7.) Defendant's expert report does not opine on the specific angle, but the expert's reconstruction of the positioning of the aircraft shows them slightly offset. (ECF No. 31-22 at 5.)

//

### E. Events of July 10, 2021

On the morning of July 10, 2021, the same pilots, PIC Versweyveld and SIC Lundberg departed KGTV on a flight headed to Ontario International Airport in California. (ECF Nos. 31-8 at 7; 35-7 at 3; 35-8 at 4). Versweyveld conducted a pre-flight inspection which "appeared to be fully normal." (ECF No. 35-7 at 4.) Once in the air, the pilots experienced control abnormalities and made an emergency landing at Harry Reid International Airport (then McCarran International Airport). (*Id.* at 6.) The pilots performed a post-flight inspection, in which they noticed that the aircraft's elevators were uneven and that there was abrasion and cracks on some hinge points. (*Id.* at 7; ECF No. 35-8 at 7.) Lundberg testified that these issues are something that would have been noticed on a pre-flight inspection, and Versweyveld testified that "there was definitely some scuffing after we landed that I would not have taken off with, had I seen it." (ECF Nos. 35-8 at 7; 35-7 at 8.) The flight recorder data indicates that both elevators were locked evenly at zero degrees when the Latitude was powered off on July 9, 2021, but that when the plane was powered on July 10, 2021, the elevators were uneven, with one of the elevators "deflected trailing edge down at 14.8 degrees." (ECF No. 35-9.) Defendant's expert testified that the damage to the Latitude was consistent with a jet blast. (ECF No. 31-2 at 28.)

## II.    LEGAL STANDARD

### A. Summary Judgment

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient

evidentiary basis on which a reasonable factfinder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Here, because the party seeking summary judgment is Plaintiff, who bears the ultimate burden of proof at trial, it must establish "beyond controversy every essential element" of its claim. *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003); *see also Nationstar Mortg., LLC v. Maplewood Springs Homeowners Ass'n*, 238 F. Supp. 3d 1257, 1266 (D. Nev. 2017) (moving party with the burden of proof at trial "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial").

Once the moving party satisfies Rule 56's requirements, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists[.]" *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). However, where a moving party fails to meet their initial burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-1103 (9th Cir. 2000).

**B. Negligence**

Under Nevada law, "[i]t is well established that to prevail on a negligence

7

claim, a plaintiff must establish four elements: (1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." *Sanchez v. Wal–Mart Stores, Inc.*, 221 P.3d 1276, 1280 (Nev. 2009). Further, an employer is vicariously liable for the actions of their employee where there is "proof that (1) the actor at issue was an employee, and (2) the action complained of occurred within the scope of the actor's employment." *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1179 (Nev. 1996).

## III.  ANALYSIS

### A. Duty

The parties do not dispute that the Global Express pilots owed a duty of care under both the common law and the Federal Aviation Regulations ("FARs") to exercise reasonable care in the operation of an aircraft. "Pilots are bound by 14 C.F.R. § 61.105(a) to be familiar with the information contained in these publications and in the Federal Aviation Regulations. These rules, information manuals and circulars constitute evidence of the standard of care among all pilots." *Dyer v. United States*, 832 F.2d 1062, 1069 (9th Cir. 1987). Under the FARs, the Pilot in Command ("PIC") is directly responsible for and has final authority over operation of an aircraft. 14 C.F.R. § 91.3(a). 14 C.F.R. § 91.113(b) requires that "vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft," which has been interpreted to require "the care that a reasonably prudent pilot would exercise under the circumstances." *Steering Comm. v. United States*, 6 F.3d 572, 579 (9th Cir. 1993). 14 C.F.R. § 91.13 further prohibits a pilot from "operat[ing] an aircraft in a careless or reckless manner so as to endanger the life or property of another." Similarly, under common law principles, courts have found that "[a] pilot has a duty to act as a reasonably prudent pilot would under the circumstances." *Turner v. United States*, 736 F. Supp. 2d 980, 1003 (M.D.N.C. 2010); *see also Avemco Ins. Co. v. Elliott Aviation Flight Servs., Inc.*, 86 F. Supp. 2d 824, 831 (C.D. Ill. 2000); *Foster*

*v. United States*, 728 F. Supp. 3d 473, 486 (E.D. Ky. 2024).

**B. Breach**

The parties dispute whether the Global Express pilots breached their duty of care in parking the aircraft on July 9, 2021.

Plaintiff argues that the undisputed evidence shows that the pilots on the Global Express had a duty to be aware of the Global Express's exhaust danger profile and of the Latitude's proximity, as well as a duty to exercise reasonable care to avoid causing danger to others' property. Plaintiff argues that the Global Express pilots either (1) were aware of the exhaust profile but failed to account for the Latitude's location in maneuvering the Global Express (2) were aware of both the exhaust profile and the Latitude's location but failed to exercise reasonable care in maneuvering in such a manner that exposed the Latitude to the exhaust danger, or (3) were aware of the Latitude's location and maneuvered the Global Express in a manner that they believed would not cause damage to the Latitude, but they did not possess the requisite knowledge of the Global Express's exhaust danger profile. Given the evidence that other parking options were available as well as the fact that the pilots had the option to stop the aircraft, Plaintiff argues, any of these three scenarios is a breach of the pilot's duty of reasonable care.

Defendant argues that evidence in the record supports a conclusion that the pilots acted with reasonable care. Defendant points to the testimony of the Global Express pilots that they weighed their parking options, had concerns about alternative parking spaces, and chose what they believed to be the best option. Defendant also points to their expert's testimony that as a pilot, he would have ended up parking in the same place.

Additionally, as discussed below in Section D.1., there is a genuine dispute as to the distance between the engines of the Global Express and the Latitude's tail, as well as the velocity of the exhaust blast that the Latitude was subject to.

1    Plaintiff has thus not met their burden of establishing an absence of a dispute

2    that the Global Express came close enough to the Latitude to cause exhaust blast

3    at a velocity that that would damage it. It necessarily follows that Plaintiff has

4    not shown the absence of a dispute that the pilots maneuvered the Global

5    Express in a way that they knew or should have known would cause blast damage

6    to the Latitude. Put another way, if the Latitude was not close enough to the

7    Global Express to be subject to exhaust velocity that would damage it, the pilots

8    could not have failed to exercise reasonable care in the proximity with which they

9    put the two aircraft.

10       Accordingly, the Court finds that there is a genuine dispute of material fact

11   as to whether the pilots acted with reasonable care. "The determination of

12   whether there has been a breach of duty is generally a question for the jury."

13   *Anderson v. Baltrusaitis*, 944 P.2d 797, 800 (Nev. 1997) (quoting *Perez v. Las*

14   *Vegas Medical Center*, 805 P.2d 589, 590 (Nev. 1991)).  Here, there is evidence in

15   the record which creates a dispute as to whether alternative parking was

16   available. There is also evidence in the record that a reasonably prudent pilot—

17   the Defendant's expert—would have parked in the same way and place that the

18   Global Express pilots did. Finally, Plaintiff has not established beyond

19   controversy that the Global Express's proximity to the Latitude was such that the

20   Global Express pilots knew or should have known it would cause exhaust

21   damage. Because there is evidence from which a reasonable jury could conclude

22   that the pilots did exercise reasonable care in parking the Global Express,

23   summary judgment is not appropriate as to the element of breach.

24       **C. Injury**

25       While the parties may disagree on the causation and extent of damage to

26   the Latitude, there is no dispute that the Latitude did have damage at the

27   inspection on July 10, 2021. This element is thus undisputed.

28   //

**D. Causation**

**1. Distance and Angle**

Plaintiff argues that the surveillance video and Defense expert's testimony that the damage to the Latitude was consistent with jet blast are conclusive evidence that the damage to the Latitude was caused by exposure to exhaust from the Global Express on July 9, 2021. Plaintiff also points to its expert's report finding that, at his estimated distance of 50 feet between the Global Express engines and the Latitude's tail, an exhaust blast from idle thrust would cause damage to the Latitude.

 Defendant argues in response that Plaintiff's expert's estimated distance between the Global Express's engines and the Latitude is not conclusive evidence because his estimation failed to take several factors into account, and that the expert's determination that an object 50 feet away from the Global Express's tail would be subject to 102 mile per hour winds is based on an inaccurate reading of the exhaust danger areas diagram. Thus, a genuine issues of material fact exist as to the distance and wind velocity.

The Court agrees. It appears that there is no dispute that the back of the Global Express engines and the Latitude were no more than 83 feet apart, based on the painted lines on the ground in the video footage. Defendant argues that at trial, they would, through cross-examination, be able to call into doubt Plaintiff's expert's 50-foot estimation because he himself admitted that he "eyeballed" and "guess[ed]" several distances from the video still frames. (ECF No. 35-3 at 7-8.) If a jury were to believe that the distance was further than 50 feet—say, closer to 83 feet—the evidence shows that the exhaust wind speed would be somewhere between 62-102 miles per hour. Because the Latitude, per FAA regulations, must be able to withstand of at least 72 miles per hour winds without damage, not all wind speeds within that range would be sufficient to cause damage to the aircraft. (ECF Nos. 31-8 at 13; 35-3 at 13.)

Even if a jury were to believe that the distance at issue was 50 feet, Defendant points out that Plaintiff's expert's conclusion that at 50 feet, the exhaust speed would be 102 miles per hour is contradicted by PIC Adornado's testimony about the Exhaust Danger Areas diagram. While Plaintiff's expert's report seems to state that anywhere 50 feet behind the engines would cause 102 mile per hour winds (as indicated by the red line and dot the expert added to a copy of the diagram in his report (ECF No. 31-8 at 10)), Adornado testified that at 50 feet from the engines, the velocity of the exhaust would be 102 miles per hour in a "small area." (ECF No. 31-4 at 22-23.) Indeed, without the red line and dot added to the diagram, it appears that the "102 mph" points to a small, coned area *directly* behind each engine at 50 feet from the engines. (ECF No. 35-2.) The "62 mph" appears to point to a yellow shaded coned area covering the remaining area not directly behind each engine, at 50 feet. (*Id.*) Adornado also testified that at 100 feet from the engines, the velocity would be "like a cone of 62 miles per hour and then an exterior of 34 miles per hour." (ECF No. 31-4 at 77.) This testimony appears to reflect that the "62 mph" refers to the yellow cone area, while the "34 mph" label refers to a blue area outside that cone. Thus, based on Mr. Adornado's explanation of the diagram, at 50 feet from the engines the velocity of the wind could be between 62 and 102 miles per hour, depending on the angle and placement. At 100 feet, the velocity could be between 34 and 62 miles per hour. These ranges contain wind speeds that could damage the Latitude, but also speeds the Latitude should be able to withstand without damage.

While Plaintiff's expert report states that "[t]he tail of the Global Express was directly facing the tail of Latitude, such that the exhaust from the Global Express's engine was aligned with the Latitude's tail surfaces," the report does not indicate how this was determined. (ECF No. 31-8 at 7.) Defendant's expert report shows the aircraft slightly offset—again, not indicating how this was

1    determined. (ECF No. 31-22 at 5.) The video footage is also not clear enough to

2    conclusively show the angle of the jets in relation to one another. (ECF No. 31-

3    14.)

4        Accordingly, the Court finds that there is a genuine dispute of material fact

5    as to the distance between the Global Express engines and the Latitude's tail as

6    well as the angle at which the exhaust hit the Latitude. Because there is a genuine

7    dispute of material fact as to whether the Latitude was in fact subjected to wind

8    speeds which would cause it damage, summary judgment on causation is not

9    appropriate here.

10        **2. Pre-Flight Inspection**

11        Defendant also argues that evidence in the record indicates that the

12    damage did not exist immediately after the July 9, 2021 incident. Indeed, the

13    pilots of the Latitude testified that they did a pre-flight inspection on the morning

14    of July 10 which appeared to be normal. Damage to the Latitude was not

15    discovered until after the Latitude took off and then made an emergency landing.

16    The Latitude pilots also testified that they would have noticed the damage to the

17    elevators as well as visible cracks on the aircraft had they existed at the time of

18    the pre-flight inspection. A rational trier of fact could conclude from this evidence

19    that because the damage was not visible immediately after the incident, and

20    instead appeared after another flight, that it was not caused by the exhaust from

21    the Global Express. This is an additional reason that summary judgment is not

22    appropriate as to causation.

23    //

24    //

25    //

26    //

27    //

28    //

1  **IV.    CONCLUSION**

2         It is therefore ordered that Plaintiff's partial motion for summary judgment

3  (ECF No. 31) is DENIED.

4         Dated this 29th day of May 2025.

5

6         _____

7         ANNE R. TRAUM
        UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28